# CAUSE NO. 07-40277

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

RETRACTABLE TECHNOLOGIES INCORPORATED
Plaintiff – Appellee

v.

ABBOTT LABORATORIES INC.
Defendant – Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
Civil Action No. 5:05-CV-157

_____

# BRIEF OF APPELLEE
# RETRACTABLE TECHNOLOGIES INCORPORATED

_____

**Nicholas H. Patton**
**PATTON, TIDWELL &**
**SCHROEDER, LLP**
**4605 Texas Boulevard**
**P. O. Box 5398**
**Texarkana, Texas 75505-5398**
**(903) 792-7080**
**(903) 792-8233 (Telecopy)**

**George E. Bowles**
**Paul F. Schuster**
**Cynthia K. Timms**
**LOCKE LIDDELL & SAPP PLLC**
**2200 Ross Avenue, Suite 2200**
**Dallas, Texas 75201-6776**
**(214) 740-8000**
**(214) 740-8800 (Telecopy)**

# ATTORNEYS FOR APPELLEE
# RETRACTABLE TECHNOLOGIES INCORPORATED

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## Parties

1.    Plaintiff/Appellee:  Retractable Technologies, Inc. is a publicly-owned company and does not have a parent company. There is no corporation that owns 10% or more of the stock of Retractable Technologies, Inc.

2.    Defendant/Appellant:  Abbott Laboratories, Inc. is not a publicly held corporation. Abbott Laboratories is a publicly-owned corporation, is the parent company of Abbott Laboratories, Inc., and owns 10% or more of Abbott Laboratories, Inc.'s stock. No publicly-owned company owns 10% or more of Abbott Laboratories' stock and Abbott Laboratories has no parent company.

3.    Defendant/Appellant: Hospira Inc. is not a party to this case, but apparently has assumed responsibility for Abbott Laboratories, Inc.'s defense. Hospira, Inc. is a publicly-owned company, has no parent company, and no publicly owned company owns 10% or more of Hospira Inc.'s stock.

i

**<u>Counsel</u>**

1.     Counsel for Plaintiff/Appellee:   George E. Bowles, Paul F. Schuster, Cynthia K. Timms, Locke Liddell & Sapp PLLC, Dallas, Texas; Nicholas H. Patton, Patton, Tidwell & Schroeder LLP, Texarkana, Texas.

2.     Counsel for Defendant/Appellant:   Paul F. Strain, John A. McCauley, Venable LLP, Baltimore, Maryland; W. Lance Lee, Young, Pickett & Lee, Texarkana, Texas.

_____
Cynthia Keely Timms

## STATEMENT REGARDING ORAL ARGUMENT

Retractable Instruments, Inc. does not believe this Court will need oral argument to decide this case.  First, this case involves only a single issue.  Abbott argues the word "may" unambiguously meant "shall" when used in an arbitration provision even though the parties used "shall" in their other arbitration provisions that were a part of the same transaction.  Retractable argues that—given the other agreements and other circumstances—the  district court was correct to conduct a preliminary trial as to the parties' intent and ultimately to conclude the word "may" was intended to have its usual permissive meaning.

Second, there is no dispute regarding the background facts.  There was a one-day preliminary trial and the district court determined the facts in Retractable's favor.  Abbott has not challenged the court's findings and does not challenge the sufficiency of the evidence.  Instead, it argues the trial should not have occurred at all and that this Court should generally ignore the evidence from that trial.

Third, the principles that apply to this case are well-established.  They are normal contract construction principles.  Although Abbott attempts to argue largely from federal labor law that "may" means "shall" in arbitration provisions, those cases are distinguishable.

If, however, this Court decides that it wishes to hear oral argument, Retractable would like to participate in that argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS...................................................................................iv

TABLE OF AUTHORITIES ............................................................. vii

INTRODUCTION ...........................................................................................1

STATEMENT OF THE ISSUE ............................................................3

FACTUAL AND LEGAL BACKGROUND OF THE CASE..............................4

    A.    Statement of the Case.........................................................4

    B.    Statement of Facts...........................................................6

SUMMARY OF THE ARGUMENT .................................................12

ARGUMENT..................................................................................................16

    A.    Introduction ....................................................................16

    B.    Standard of Review.........................................................16

    C.    Background on the Issues Before the District Court..........................17

    D.    The Agreement At Issue ................................................20

    E.    Under Texas Rules Of Contract Construction And Interpretation, The National Marketing and Distribution Agreement Is Ambiguous And The District Court Was Correct To Conduct A Preliminary Trial On Contract Interpretation .............22

        1.    Contracts Signed As A Part Of The Same Transaction Should Be Construed Together ...............................................24

        2.    Courts Should Also Look At The Circumstances Surrounding The Formation Of The Agreement When Interpreting Contractual Language.........................................28

3.      Examining The Surrounding Circumstances Includes An Examination Of The Parties' Negotiations ..............................30

4.      This Case Does Not Involve The Parol Evidence Rule............33

5.      The Court's Ability To Examine Certain Extrinsic Evidence Is Not Affected By The Integration Clause ..............34

6.      In Sum, The District Court Acted Correctly In Looking At The Other Contracts, The Surrounding Circumstances, And The Parties' Negotiations, And In Determining That The ADR Provision Was Ambiguous .....................................36

F.      None Of Abbott's Authorities Change The Result That The National Marketing and Distribution Agreement Is Ambiguous And The District Court Was Correct In Concluding That It Did Not Require The Parties To Arbitrate..................................38

1.      None Of Abbott's Cases Involve Situations Where The Parties Changed The Word "Shall" To "May" ........................39

2.      The ADR Provision Here Has Meaning If The Provision Is Voluntary ............................................................................41

3.      Most Of Abbott's Citations Involve Labor Relations, Collective Bargaining Agreements, Relations With Unions, And Similar Matters ..................................................44

4.      Many Of Abbott's Cases Involve Arbitration Provisions To The Effect That Either Party May Refer The Case To Arbitration ..........................................................................49

5.      Cases Also Hold That "May" Makes Arbitration Permissive, Particularly When The Parties Specifically Chose To Use The Word "May" As Opposed To The Word "Shall" ......................................................................52

6.      There Is No Established Legal Meaning That "May" Means "Shall" When Used In An Arbitration Provision So That "May" Can Be Given Its Usual Permissive Meaning...............................................................................55

CONCLUSION ...............................................................................56

CERTIFICATE OF SERVICE............................................................................58

CERTIFICATE OF COMPLIANCE....................................................................59

# TABLE OF AUTHORITIES

PAGE

## CASES

*A. Dubreuil and Sons v. Town of Lisbon*,
577 A.2d 709 (Conn. 1990)..............................................................53, 54

*AF-Cap, Inc. v. Republic of Congo*,
462 F.3d 417 (5th Cir. 2006).................................................................16

*AT&T Technologies, Inc. v. Commun. Workers of Am.*,
475 U.S. 643 (1986).................................................................................46

*Am. Italian Pasta Co. v. The Austin Co.*,
914 F.2d 1103 (8th Cir. 1990)....................................................48, 49, 52

*Atkins v. Louisville and Nashville R.R. Co.*,
819 F.2d 644 (6th Cir. 1987)..........................................................44, 50

*Austin v. Owens-Brockway Glass Container, Inc.*,
78 F.3d 875 (4th Cir. 1996)...................................................................44

*Bank of Am. N.A. v. Haag*,
37 S.W.3d 55 (Tex. App.—San Antonio 2000, no pet.) .........................33

*Block 175 Corp. v. Fairmont Hotel Mgmt. Co.*,
648 F. Supp. 450 (D. Colo. 1986) ...................................................48, 50

*Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*,
790 S.W.2d 738 (Tex. App.—Dallas 1990, writ denied).......................33

*Buck Consultants, Inc. v. Glenpointe Assoc's*,
217 Fed Appx. 142 (3d Cir. 2007) ........................................................43

*Calpetco 1981 v. Marshall Expl., Inc.*,
989 F.2d 1408 (5th Cir. 1993)...............................................................24

*Carr v. Christie,*
970 S.W.2d 620 (Tex. App.—Austin 1998, pet. denied) ........................30

*Ceres Marine Terminals, Inc. v. Int'l Longshoremen's Assoc., Local*
*1969,* 683 F.2d 242 (7th Cir. 1982) ..................................................44, 47

*City of Pinehurst v. Spooner Addition Water Co.,*
432 S.W.2d 515 (Tex. 1968) .................................................................31

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,*
940 S.W.2d 587 (Tex. 1996) .................................................................29

*Cook Composites, Inc. v. Westlake Styrene Corp.,*
15 S.W.3d 124 (Tex. App.—Houston [14th Dist.] 2000, pet.
dism'd) .............................................................................................28, 30

*Crisalli v. ARX Holding Corp.,*
177 Fed. Appx. 417, 2006 WL. 1049122 (5th Cir.
April 20, 2006) ......................................................................................29

*Deaton Truck Line, Inc. v. Local Union 612,*
314 F.2d 418 (5th Cir. 1962) .....................................................45, 47, 48

*Dell Computer Corp. v. Rodriguez,*
390 F.3d 377 (5th Cir. 2004)...............................................................17

*EEOC v. Waffle House, Inc.,*
534 U.S. 279 (2002)......................................................... 18, 43, 44, 49

*FPJ Investments, LLC v. Ameritx, LLC,*
2006 WL. 2556409 (Conn. Super. Ct. Aug. 11, 2006) ..........................55

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938 (1995)..............................................................................18

*Fleetwood Enters., Inc. v. Gaskamp,*
280 F.3d 1069 (5th Cir. 2002)............................................. 18, 43, 44, 49

*Gonzalez v. Denning,*
394 F.3d 388 (5th Cir. 2004).....................................................19, 22, 37

*Hanssen v. Qantas Airways Ltd.*,
   904 F.2d 267 (5th Cir. 1990)...............................................................29

*Held v. Nat'l R.R. Passenger Corp.*,
   101 F.R.D. 420 (D.D.C. 1984).......................................................48, 50

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002).........................................................................17, 18

*Hubacek v. Ennis State Bank*,
   317 S.W.2d 30 (Tex. 1958)............................................................33, 35

*J.M. Davidson, Inc. v. Webster*,
   128 S.W.3d 223 (Tex. 2003)....................................................19, 37, 38

*Jama v. Immigration and Customs Enforcement*,
   543 U.S. 335 (2005).......................................................................23, 41

*Jim Walter Homes, Inc. v. Schuenemann*,
   668 S.W.2d 324 (Tex. 1984)...............................................................24

*Law Office of C. Kendall Harrell v. Commerce Sav. Ass'n*,
   824 F. Supp. 1159 (W.D. Tex. 1993) ..................................................25

*Lee v. Pathology Assoc. & Consultants, P.C.*,
   2003 WL. 22133954 (Conn. Super. Ct. Aug. 26, 2003) ......................55

*Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*,
   925 S.W.2d 565 (Tex. 1996)...............................................................37

*Local 771, IATSE, v. RKO Gen'l, Inc.*,
   546 F.2d 1107 (2d Cir. 1977).......................................................45, 50

*Local Union No. 898 of the Int'l  Brotherhood of Elec. Workers v. XL
   Elec., Inc.*, 380 F.3d 868 (5th Cir. 2004) ...........................................16

*Lynchburg Foundry Co. v. Patternmakers League of N. Am.*,
   597 F.2d 384 (4th Cir. 1979).......................................................52, 53

*Morello v. Federal Barge Lines, Inc.*,
    575 F. Supp. 87 (D.C. Mo. 1983), *aff'd*, 746 F.2d 1347
    (8th Cir. 1984) ........................................................................44

*Nalle v. Taco Bell Corp.*,
    914 S.W.2d 685 (Tex. App.—Austin 1996, writ denied)..................23, 41

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*,
    907 S.W.2d 517 (Tex. 1995) .........................................................29, 38

*Nemitz v. Norfolk and W. Ry. Co.*,
    436 F.2d 841 (6th Cir. 1971) ................................................................45

*New York Cross Harbor R.R. Terminal Corp. v. Consolidated Rail
    Corp.*, 72 F. Supp. 2d 70 (E.D.N.Y. 1998) ......................................48, 50

*Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*,
    636 F.2d 51 (3d Cir. 1980).....................................................................17

*In re Prudential Ins. Co. of Am.*,
    148 S.W.3d 124 (Tex. 2004) .................................................................24

*Reliant Energy Servs. Inc. v. Enron Canada Corp.*,
    349 F.3d 816 (5th Cir. 2003) .................................................................23

*State Farm Life Ins. Co. v. Beaston*,
    907 S.W.2d 430 (Tex. 1995) .................................................................23

*Sun Oil Co. (Delaware) v. Madeley*,
    626 S.W.2d 726 (Tex. 1981) .....................................................29, 30, 31

*Sw. Bell Tel. v. Pub. Util. Comm. of Texas*,
    208 F.3d 475 (5th Cir. 2000)..................................................................29

*Tower Contracting Co. v. Flores*,
    302 S.W.2d 396 (Tex. 1957)..................................................................25

*United SteelWorkers of Am. v. Fort Pitt Steel Casting*,
    598 F.2d 1273  (3d Cir. 1979).................................................................44

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960)................................................................45, 46, 48

*United Steelworkers v. Am. Mfg. Co.*,
  363 U.S. 564 (1960)......................................................................44, 45

*Volt Info. Sci. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989)...............................................................................18

*Webb v. Investacorp, Inc.*,
  89 F.3d 252 (5th Cir. 1996)....................................................................18

*Will-Drill Res., Inc. v. Samson Res. Co.*,
  352 F.3d 211 (5th Cir. 2003)..............................................17, 18, 43, 44

*Wright v. Universal Maritime Serv. Corp.*,
  525 U.S. 70 (1998)................................................................................47

*XCO Prod. Co. v. Jamison*,
  194 S.W.3d 622 (Tex. App.—Houston [14th Dist.] 2006,
  pet. denied) ...........................................................................................28

*Young Brothers, Ltd. v. Int'l Longshore and Warehouse Union, Local
  142*, 250 F. Supp. 2d 1244 (D. Hawaii 2003)..................................43, 53

*Zars, Inc. v. LTS Lohmann Therapy Sys. Corp.*,
  No. 2:05-CV-198-TC, 2006 WL. 2992719 (D. Utah
  Oct. 18, 2006) ................................................................................48, 50

## STATUTES

9 U.S.C. §4    .........................................................................5, 17, 36, 44

9 U.S.C. §16(a)........................................................................................6

## TREATISES AND RESTATEMENTS

WILLISTON ON CONTRACTS §609, (3rd ed. 1961)..........................................31

RESTATEMENT OF CONTRACTS §230 (1932)................................................31

RESTATEMENT (SECOND) OF CONTRACTS §209(1) (1981) ...........................35

RESTATEMENT (SECOND) OF CONTRACTS §210(1) (1981) ...........................35

RESTATEMENT (SECOND) OF CONTRACTS §212(1) (1981) ...........................35

RESTATEMENT (SECOND) OF CONTRACTS §212, cmt c (1981) .....................36

RESTATEMENT (SECOND) OF CONTRACTS §214, (1981)...............................36

## <u>MISCELLANEOUS</u>

*Mark K. Glass & Keith A. Rowley, On Parol: The Construction and Interpretation of Written Agreements and the Role of Extrinsic Evidence in Contract Litigation,* 49 Baylor L. Rev. 657 (Summer 1997) ......................................................................................24, 33, 34

## INTRODUCTION

There are three focal points that are at the heart of this appeal. First, the parties had considerable negotiations regarding whether to have any kind of arbitration provision at all and, if there was to be any arbitration provision, whether the arbitration would be mandatory or optional. The initial draft, by Abbott, of the arbitration provision stated that if the company's respective presidents failed to reach a resolution of any dispute, "then such dispute <u>shall</u> be resolved by <u>binding</u> Alternative Dispute Resolution . . . ." Ex 10, ¶10.2 (RTI 638) (emphasis added); Tr:106-07. After much discussion, the parties ultimately agreed that, if their presidents could not resolve the issue, "then such dispute <u>may</u> be resolved by Alternative Dispute Resolution . . . ." Ex 28, ¶12.2 (ABB 1459) (emphasis added); Tr:207. Thus, the question is whether the ADR provision should be construed as a matter of law (as Abbott argues) to have the exact same meaning that Abbott's original proposed (and rejected) ADR provision would have.

Second, the parties entered into three other agreements as a part of the same transaction. Those agreements demonstrate that the parties did not take a single approach to arbitration. The other agreements also showed that the parties chose different terms with regard to their ADR provisions. One of the other agreements did not have any ADR provision at all; two agreements said that the parties "shall" submit their disputes to ADR. So the question here is whether the trial court was correct to recognize that the different ADR language used in the different contracts

1

raised a question as to what the parties meant when they said that they "may" arbitrate in the agreement at issue.

Third, Abbott takes a markedly unusual approach to the construction of the ADR provision. The ADR provision itself is very short. It states the presidents of the two companies will attempt to resolve any dispute and, if they fail to do so, the "dispute may be resolved by [ADR] in the manner described in Exhibit 12.2." Ex 28, ¶12.2 (ABB 1459). That is all the ADR provision says. The ADR provision *does not state* that "either party may initiate an ADR proceeding," contrary to the impression left by Abbott's brief. That phrase is found only in Exhibit 12.2, a four-page document that spells out the details of how the parties would conduct an arbitration, if one occurred. Ex 28, Ex 12.2 (ABB 1524). Many of Abbott's arguments assume the language used in the accompanying procedure in Exhibit 12.2 should be treated as if it was the basic agreement to arbitrate. For example, Abbott states that "*[t]he arbitration clause . . . expressly states* that if a matter in dispute cannot be resolved" by the presidents' negotiations, "'either party may initiate an ADR proceeding as provided herein.'" Appellant's Brief at 14 (emphasis added). As seen, however, the arbitration clause says nothing of the kind; it is the separate procedure that contains that language. Under the guise of reading the contract with its exhibits, Abbott transports bits and pieces of the

exhibit into an entirely different context in the agreement. This approach taints many of Abbott's arguments in its brief.

## STATEMENT OF THE ISSUE

The issue here is whether the district court was correct to conduct a preliminary trial to determine what the parties intended by the use of the word "may" in their ADR provision where:

- The ADR provision states that the parties "may" arbitrate. As a part of the same transaction, the parties signed two other agreements stating that they "shall" arbitrate the disputes in those agreements. In a fourth agreement, there is no ADR provision at all.

- The parties began with an ADR provision that stated disputes "shall" be resolved through ADR and, through the process of negotiation, changed that provision to read that disputes "may" be resolved through ADR.

If the district court's decision to conduct a preliminary trial was correct, there are no other issues before the Court because Abbott has not challenged the evidence supporting the district court's Findings of Fact. It has only challenged the district court's initial decision to conduct the preliminary trial.

## FACTUAL AND LEGAL BACKGROUND OF THE CASE

**A.    Statement of the Case**

This is an appeal from a preliminary trial conducted pursuant to 9 U.S.C. §4 to determine whether the parties had agreed to arbitration.  2R:249.  Following a short one-day trial to the bench, the district court determined that Abbott had failed to bear its burden to show the parties agreed to mandatory arbitration.  2R:398.  On appeal, Abbott Laboratories, Inc. ("Abbott") does not challenge the district court's factual findings.  Instead, it challenges only whether the district court should have conducted the trial in the first place, because Abbott claims that the parties' agreement provides for mandatory arbitration as a matter of law.

This action began when Retractable Technologies Inc. ("Retractable") filed suit against Abbott for breach of contract and fraud.  1R:10.  In response, Abbott filed a motion to dismiss or to compel arbitration.  1R:31.  The agreement at issue—called the National Marketing and Distribution Agreement (also, the "Agreement")—contained a paragraph titled "Alternative Dispute Resolution," the entirety of which reads as follows:

> 12.2    Alternative Dispute Resolution.  The Parties agree that any dispute that arises in connection with this Agreement shall first be presented to the respective presidents of Manufacturer and the Hospital Products Division of Marketer, or their designees, for resolution.  If no resolution is reached, then such dispute may be resolved by Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 12.2.  [Ex 28, ¶12.2 (ABB 1459) (emphasis added).]

The parties filed several briefs on the issue of whether the district court should conduct a preliminary hearing pursuant to the terms of 9 U.S.C. §4. 1R:31, 98, 177; 2R:210, 225, 233, 243. In other agreements dated that same day and signed as a part of the same transaction, the parties had agreed to mandatory arbitration by using the word "shall" in those other agreements. 2R:259. The district court also noted that the parties' original draft provided that any disputes "shall be resolved by binding" arbitration and that they had changed that language during their negotiations to say that disputes "may be resolved" by arbitration. *Id.*

The district court observed that the ADR provision was reasonably susceptible to two interpretations: either (1) that it "requires consent of both parties"; or (2) "one party can obligate the other party to participate." 2R:258. As a result, the district court concluded that it was appropriate to conduct a preliminary trial to determine "which reasonable interpretation of the ADR Provision the parties actually agreed upon when they entered into the Agreement." 2R:259.

The district court conducted a one-day preliminary trial in December 2006 to determine whether the parties had entered into a mandatory agreement to arbitrate. 2R:283. Each side presented several witnesses regarding the background information surrounding the parties' signing of the agreement at issue and other agreements that were signed as a part of the same transaction. Two months later,

the district court entered its order and its findings of fact and conclusions of law regarding the preliminary trial. 2R:382. After considering the evidence at the preliminary trial, the district court concluded that the parties did not agree to mandatory arbitration and that Abbott cannot force Retractable to arbitrate. 2R:382, 398. Abbott timely appealed from that order pursuant to 9 U.S.C. §16(a). 2R:400.

## B.    Statement of Facts[1]

Retractable has the exclusive license for a number of patents on safety syringes and is in the business of manufacturing and selling retractable syringes in which the needle automatically retracts into the syringe after use. Tr:124, 245-46. The automatic retraction of the needle provides a unique safety feature that prevents health workers from being stuck with used needles. Abbott sells products, including equipment, to hospitals. Tr:20-21.

This lawsuit arises out of a transaction that Retractable and Abbott entered into in May 2000 in which Abbott agreed to market and distribute certain Retractable products called VanishPoint® products. Tr:60. As a part of that transaction, the parties signed four agreements dated the same day: (1) the

---

[1] For the most part, these facts come from the district court's Findings of Fact and Conclusions of Law, supplemented as needed by other evidence from the December preliminary trial. Abbott has not challenged or disputed any of the district court's findings or the sufficiency of any of the evidence at the preliminary trial. The exhibits referenced herein were exhibits at the preliminary trial.

National Marketing and Distribution Agreement, the agreement at issue in this appeal (Tr:207; Ex 28); (2) the Registration Rights Agreement (Tr:208; Ex 29); (3) a Credit Agreement (Tr:208, Ex 31); and (4) a Security Agreement (Ex 30).

The parties reached the agreement at issue after significant negotiation. Retractable and Abbott had an initial meeting in 1997, when representatives from Abbott went to Retractable's facility in Texas and expressed an interest in Retractable's technology. Tr:125-126.  Retractable and Abbott met again in December 1999 at Abbott's offices in Illinois.  Tr:59, 124.

After the December 1999 meeting, Abbott sent a letter to Retractable setting forth Abbott's proposed arrangement for marketing Retractable's products. Tr:127, Ex 1.  On February 1, 2000, Retractable's CEO—Thomas Shaw—sent a draft of a National Marketing and Distribution Agreement to Abbott.  Tr:128, 242-43; Ex 5.  The February 1, 2000 draft did not have any provisions for arbitration; it provided for litigation in Texas courts.  Tr:128; Ex 5 (RTI 28).

On February 24, 2000, Abbott sent Retractable its draft of the National Marketing and Distribution Agreement.  Tr:60; Ex 10.  It was completely different from Retractable's first draft.  Tr:188.  The February 24 draft (Ex 10) contained an arbitration provision that mandates the parties "shall" arbitrate.  Ex 10, ¶10.2 (RTI 638); Tr:107.  It stated:

> The Parties agree that any dispute that arises in connection with this
> Agreement shall first be presented to their respective presidents of

> Manufacturer and the Hospital Products Division of Marketer, or their designees, for resolution.  If no resolution is reached, then such dispute <u>shall</u> be resolved by <u>binding</u> Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 10.2.

Ex 10, ¶10.2 (RTI 638) (emphasis added); Tr:106-07.   According to one of Abbott's witnesses, Abbott's management would not agree to a contract that did not have a provision for ADR.  Tr:93.

On March 1, 2000, Retractable's CEO Shaw sent a revised agreement to Abbott.  Tr:189-90; Ex 11.  That agreement was a mark-up of Abbott's February 24 draft (Ex 10).  Tr:131.  In the mark-up, Retractable removed the arbitration provisions and the procedure for arbitrating that had been a part of Abbott's draft (Ex 10).  Ex 11, ¶10.2 (RTI 662); Exhibit 10.2 (RTI 671-74); Tr: 62, 107-08, 131-32.  The following day, the parties met at Retractable's Texas offices.  Tr:34, 62, 189-90.

Shaw attended the March 2 meeting for part of the time and stated at the meeting that arbitration was not acceptable to him.[2]  Tr:108-09, 133, 135, 191, 247.  An Abbott witness testified he told Retractable that Abbott could not get the agreement signed without an ADR provision.  Tr:94-95.  Following that meeting, the parties exchanged drafts that alternatively contained and did not contain an ADR

---

[2]  Abbott's version of the events at this meeting and in other negotiations was considerably different from Retractable's version.   Nevertheless, Abbott has not challenged the evidence from the preliminary trial and has not requested that the district court's findings be reversed.

provision; Retractable sent a draft that had no such provision and Abbott sent a draft that had one.  Ex 12, ¶10.2 (RTI 3841-42); Ex. 13, ¶10.2 (RTI 2348); Tr:193.

After this exchange, representatives for Retractable spoke with Laurie Hernandez, Abbott's lead negotiator on the transaction.     Tr:15-18, 140. Retractable's representatives (Lillian Salerno and Michele Larios) again expressed Shaw's refusal to agree to mandatory arbitration.  Tr:140.  Retractable's in-house counsel, Michele Larios, told Hernandez that Shaw would agree to a provision that did not require arbitration but allowed for the possibility of arbitration if both parties agreed.  Tr:185-86, 195.  Larios understood that Abbott was agreeable to that arrangement.   Tr:195.   Larios further understood that there would be a voluntary arbitration process.  Tr:196.  Larios and Hernandez agreed to effect the voluntary nature of the arbitration provision by removing the word "shall" and replacing it with the word "may" and removing the word "binding."  Tr:196.

On March 17, 2000, Retractable sent Abbott a revised National Marketing and Distribution Agreement.   Ex 14 (RTI 3859).   In that document, the word "shall" no longer appeared in the second sentence of paragraph 10.2.  Ex 14, ¶10.2 (RTI 3871).  Rather, "may" appeared in its stead, so that the second sentence of that section then read, "If no resolution is reached, then such dispute <u>may</u> be resolved by binding Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 10.2."  Ex 14, ¶10.2 (RTI 3871) (emphasis added).

9

Later, it became apparent that the word "binding" was still in the agreement. Tr:200-01.  At a meeting in April, the parties discussed the word "binding" and the fact that it needed to be removed from the document.   Tr:200; *see also* Tr:143, 202-03.

The parties signed the final version of the National Marketing and Distribution Agreement on May 4, 2000.  Ex 28; Tr:207.  In that final version of that document, the parties substituted "may" for "shall" and removed any reference to a "binding" arbitration:

> The Parties agree that any dispute that arises in connection with this Agreement shall first be presented to their respective presidents of Manufacturer and the Hospital Products Division of Marketer, or their designees, for resolution.  If no resolution is reached, then such dispute <u>may</u> be resolved by Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 12.2.

Ex 28, ¶12.2 (ABB 1459) (emphasis added); Tr:207.

Retractable and Abbott also signed three other agreements dated May 4, 2000 as a part of the same transaction.  Tr:207-09.  The first of those agreements was the Registration Rights Agreement.  Ex 29; Tr:208.  That agreement had an ADR provision that made arbitration mandatory, stating that the parties "shall" engage in ADR:

> The parties agree that any dispute that arises in connection with the Agreement, which cannot be amicably resolved by such representative within thirty (30) days after the receipt of such written notice, <u>shall</u> be resolved by <u>binding</u> Alternative Dispute Resolution ("ADR") in the manner described in **Annex B** to the Credit Agreement.

Ex 29, ¶4.4 (RTI 1811) (bold in original, underlining added); Tr:208.

The second agreement was the Credit Agreement. Ex 31; Tr:208. That agreement also provided for mandatory arbitration, stating that "Disputes shall be resolved as provided in Annex B attached hereto." Ex 31, ¶12.9 (RTI 1861) (emphasis added); Tr:209. "Annex B" to the Credit Agreement sets out the manner in which disputes will be arbitrated. Ex 31, Annex B (RTI 1866-68). The fourth agreement dated May 4, 2000 in conjunction with the same transaction was the Security Agreement. Ex 30. In contradiction to Abbott's assertion at the trial that their management would not enter an agreement that lacked an ADR provision, the Security Agreement contained *no ADR provision*. Ex 30; Tr:209.

Thus, the parties ended up with several different approaches regarding ADR. Once they agreed that they would have no ADR; twice they agreed to mandatory arbitration; and once they said that they "may" arbitrate. In that agreement (the National Marketing and Distribution Agreement), the parties started out with a clause that mandated arbitration by stating disputes "shall" be resolved by ADR. After negotiations, they changed the "shall" to "may" and removed any requirement for "binding" ADR. For this reason, the district court decided that it could not construe "may" as meaning "shall" as a matter of law. Instead, it decided that it needed to conduct a preliminary trial to determine what the parties

intended when they said that disputes "may" be resolved by ADR. And it correctly concluded that the parties had not agreed to mandatory arbitration.

## SUMMARY OF THE ARGUMENT

Agreements to arbitrate are construed just like other contracts: the court must attempt to ascertain the parties' true intent as they expressed it in the agreement. In determining whether the parties agreed to arbitrate, the federal policy favoring arbitration does not apply. The party seeking to compel arbitration has the burden of proving that there is an agreement to arbitrate.

The provision at issue in this case only states that, if the corporate presidents cannot resolve a dispute, the dispute "may" be resolved by ADR. The agreement does not state that "either party may initiate an ADR proceeding." Instead, that phrase appears in a four-page exhibit that sets out the procedure for arbitration, should the parties decide to arbitrate. Abbott treats that one sentence of the procedure as if it appears in the basic ADR provision—thereby creating confusion as to what language this Court should be construing.

The parties signed four agreements as a part of the same transaction. Two agreements have provisions for mandatory arbitration and use the word "shall" in the ADR provision. One of the other agreements had no provision for ADR. The Agreement at issue here had a provision for ADR that said the parties "may" resolve their disputes through ADR. "May" generally is a permissive term that

does not create a mandatory requirement. The district court was required to construe the National Marketing and Distribution Agreement with the other three contemporaneous agreements. Examining those other agreements showed that the parties (1) deliberately created different ADR provisions and (2) deliberately used the word "may" in the National Marketing and Distribution Agreement in contrast to the word "shall" used in two other agreements. This alone warranted the district court's decision to conduct the preliminary trial in order to assess the parties' intent in using the word "may."

Additionally, Texas law states that courts should consider surrounding circumstances when construing contracts—even before determining whether there is an ambiguity. The "surrounding circumstances" include evidence of the parties' negotiations. Here, the surrounding circumstances showed that the parties had vigorously negotiated whether to have any arbitration at all and whether the arbitration should be voluntary or mandatory. They began with a draft of an agreement from Abbott that stated the parties "shall" submit disputes to ADR and, after considerable back and forth, decided to say the parties "may" submit disputes to ADR. The parties also removed the word "binding" from the arbitration provision. These are further reasons that the district court was correct in conducting the preliminary trial regarding the parties' agreement and in ultimately concluding that ADR was optional.

In this case, the fact that the arbitration is voluntary does not make the ADR provision "meaningless," as Abbott insists. The Agreement attaches a detailed procedure that would govern an arbitration should the parties agree to resolve their disputes that way. The procedure anticipates a very time-limited proceeding with no discovery. It is not the kind of arbitration procedure that would work for every kind of dispute. Thus, the Agreement allows the parties to choose to arbitrate under that procedure if it is appropriate for the particular disputes. On the other hand, if that procedure would not be appropriate, they are not required to arbitrate.

Abbott's cases are distinguishable. First, none of those cases involve a consideration of the kinds of circumstances that exist here. None involve contemporaneous agreements showing that the parties also used the word "shall" in other ADR provisions signed as a part of the same transaction. None involve a showing that the parties purposefully changed the word "shall" to "may" as a result of their negotiations.

Second, Abbott's cases generally are labor cases or rely upon labor authorities. Arbitration in the labor context is subject to different public policy constraints. There is a strong public policy favoring arbitration in labor cases because, there, arbitration avoids strikes and lockouts. It is an important aspect of federal labor law that collective bargaining agreements call for arbitration and that the parties actually arbitrate rather than strike.

Third, many of Abbott's cases involve language stating that "either party may refer" the dispute to arbitration. That language is vastly different than the language used in the ADR provision here, which states that disputes "may" be resolved by ADR. A separate exhibit *addressing procedures to be used* in the event of an arbitration states that "either party may initiate an ADR proceeding" but that is simply a statement of how the parties might commence an (agreed-upon) arbitration. That language does not appear in the Agreement—contrary to the impression Abbott creates.

Finally, there are cases that interpret the word "may" as used in arbitration provisions as meaning that arbitration is voluntary. One case in particular involves a situation wherein—as here—the parties changed the word "shall" to "may." That case holds that arbitration is voluntary because, otherwise, the parties' negotiated change would not have any meaning. That case, and others, show that "may" certainly does not consistently mean "shall" when used in arbitration provisions, as Abbott argues.

The district court was correct to conduct the preliminary trial regarding the parties' intent and to conclude that the parties intended to have a voluntary (not mandatory) arbitration.

# ARGUMENT

## A.    Introduction

Abbott's Brief presents two general arguments in support of its appeal. First, it argues that, under proper contract construction principles, the district court should have only looked at the parties' National Marketing and Distribution Agreement in interpreting what the parties meant when they said they "may" resolve their disputes through an attached ADR process that calls for arbitration. Second, Abbott argues that federal cases interpreting the word "may" in the context of an arbitration provision supposedly uniformly interpret that word to mean "shall."  Neither of these arguments is valid, as will be shown below.

## B.    Standard of Review

Abbott challenges only the legal rulings made by the district court. Specifically, Abbott challenges the district court's decision to conduct the preliminary trial and argues that the agreement unambiguously commits the parties to mandatory arbitration.

The standard of review for the questions that Abbott presents is the *de novo* standard.  *See AF-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 423 (5th Cir. 2006) (standard of review as to questions of law is *de novo*).  With regard to a "district court's decision on whether the parties agreed to submit their dispute to arbitration" this Court "accept[s] findings of fact that are not 'clearly erroneous' but review[s] questions of law *de novo*."     *Local Union No. 898 of the Int'l*

16

*Brotherhood of Elec. Workers v. XL Elec., Inc.*, 380 F.3d 868, 870 (5th Cir. 2004).

"The interpretation of a contract and the determination of ambiguity are questions

of law," which the Court "review[s] *de novo*." *Dell Computer Corp. v. Rodriguez*,

390 F.3d 377, 384 (5th Cir. 2004).

Although there was a trial in the district court, Abbott does not challenge the

court's findings from that trial.

## C.     Background on the Issues Before the District Court

This appeal grew out of a procedure created under the Federal Arbitration

Act, which charges the court in the first instance with determining whether there is

an agreement to arbitrate.   A court should not order arbitration unless it is

"satisfied that the making of the agreement for arbitration . . . is not in issue." 9

U.S.C. §4; *see also Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 213 &

n.2 (5th Cir. 2003).   "[A]rbitration is a matter of contract and a party cannot be

required to submit to arbitration any dispute which he has not agreed so to submit."

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).   "Before a party to

a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there

should be an express, unequivocal agreement to that effect."   *Par-Knit Mills, Inc.*

*v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).

As the United States Supreme Court has pointed out, the purpose of the

Federal Arbitration Act was to "overrule the judiciary's longstanding refusal to

enforce agreements to arbitrate" and to "place such agreements *upon the same*

17

*footing as other contracts.*"  *Volt Info. Sci. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) (emphasis added).  "[T]he FAA does not require parties to arbitrate when they have not agreed to do so. . . ."  *Id.* at 478.  As a consequence, courts "look first to whether the parties agreed to arbitrate a dispute, *not to general policy goals*, to determine the scope of the agreement."  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (emphasis added).  The "*federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.* . . ."  *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (emphasis added); *see Will-Drill*, 352 F.3d at 214 (same); *see also EEOC v. Waffle House*, 534 U.S. at 294.

        As these cases stress, arbitration is a matter of contract.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).  "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Webb v. Investacorp, Inc.,* 89 F.3d 252, 258 (5th Cir. 1996).  As a result, the decision whether there is an agreement to arbitrate turns on normal contract construction principles.

        Texas contract law applies to this case.  The Texas Supreme Court has recently reiterated the general notion that "[a]lthough we have repeatedly

expressed a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Thus, ordinary rules of contract construction apply to determine whether the parties agreed to a valid and enforceable arbitration agreement. "[T]he primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (per curiam).

Following these cases, then, the district court received considerable briefing and had a hearing on the issue whether the National Marketing and Distribution Agreement was ambiguous: did the Agreement unambiguously mandate that the parties had to arbitrate, or were there two or more reasonable interpretations of the parties' use of the word "may"? The court concluded that the agreement's statement that disputes "may" be resolved by ADR was ambiguous given the other agreements' choice of different ADR provisions and given the surrounding circumstances showing the parties had purposefully changed "shall" to "may." Upon trial of that issue, the district court concluded that the parties had intended arbitration to be optional, not mandatory.

The court's conclusion that the term was ambiguous was correct for all the reasons set out below.

D.    **The Agreement At Issue**

The National Marketing and Distribution Agreement provides that Retractable will manufacture its retractable syringes and that Abbott will market those syringes on a non-exclusive basis. Ex 28, ¶2.1 (ABB 1447). The Agreement was to be for an initial term of five years, with certain rights to an earlier termination or for extension of the Agreement into a second term if certain conditions were met. Ex 28, ¶9.1-9.6 (ABB 1454-55). Overall, the Agreement is long and complicated, containing provisions for sales goals, pricing, payment, shipment, audits, and a host of other matters. Ex 28.

As discussed, the Agreement also contains a provision for alternative dispute resolution. That provision is exactly two sentences long. First, it provides that "any dispute that arises in connection with this Agreement shall first be presented to the respective presidents" of the two parties, or their designees, for resolution. Ex 28, ¶12.2 (ABB 1459). The second sentences states: "If no resolution is reached, then such dispute may be resolved by Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 12.2." *Id.* Those two sentences are the entirety of the ADR provision in the National Marketing and Distribution Agreement.

One might think from reading Abbott's brief that the Agreement itself also states that "either party may initiate an ADR proceeding. . . ." *See, e.g.,*

Appellant's Brief at 3, 11-12, 14-15, 37, 41. The Agreement does *not* say that. It only contains the two sentences set out above.

What the Agreement does do is refer to an Exhibit 12.2 that is to be used in the event that the parties agree to resolve their disputes using the ADR proceeding. Thus, the parties' Agreement varies considerably from a "typical" arbitration agreement. Typically, arbitration agreements are fairly vague. They frequently contain a simple agreement to arbitrate, perhaps adopt the rules of the American Arbitration Association, specify whether the parties will have one arbitrator or three, and perhaps contain a couple of other controls on the arbitration proceeding. But that is typically it.

Here, Exhibit 12.2 sets forth detailed ground rules for a particular type of arbitration: an arbitration that is very controlled and very short. It is a procedure that provides the parties with little opportunity to develop or to present their evidence.

First, the Exhibit starts off with the statement as to what the parties must do in order to "have such a dispute resolved by this Alternative Dispute Resolution ("ADR") provision." Ex 28, Ex 12.2 (ABB 1524). Then it sets out a series of strict controls. For example, it provides that the arbitration hearing will take place between 28 and 56 days after the arbitrator is selected. *Id.*, ¶3 (ABB 1525). It prohibits any discovery "by any means," including a ban on depositions,

interrogatories, and even document production. *Id.*, ¶4 (ABB 1525). It only allows 5 hours of hearing time per side and forces the arbitrator, within 14 days, to adopt the entirety of one side's or the other's proposed ruling or remedy on each submitted issue. *Id.*, ¶¶5, 7 (ABB 1525-26). For four pages, the parties detailed the precise manner in which any arbitration would occur. In other words, this was not a "one size fits all" arbitration proceeding. It was one that was designed to be used for issues in which a presentation could be limited, extremely brief, and presented without any form of discovery.

In connection with these many procedures, the parties provided how the parties could commence such an arbitration, should they desire "[t]o have such a dispute resolved by this [ADR] provision." *Id.* (ABB 1524). Should they decide to use that procedure, "either party may initiate an ADR proceeding as provided herein." *Id.* (ABB 1524). But that is one provision among the many provisions regarding how an ADR would occur, should one occur. And it is not a provision that appears in the body of the Agreement.

**E.     Under Texas Rules Of Contract Construction And Interpretation, The National Marketing and Distribution Agreement Is Ambiguous And The District Court Was Correct To Conduct A Preliminary Trial On Contract Interpretation**

There is one central aim when construing a contract. "[T]he primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Gonzalez v. Denning*, 394 F.3d 388, 392

(5th Cir. 2004) (per curiam).  The court must "strive to give effect to the written expression of the parties' intent." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995); *see also Reliant Energy Servs. Inc. v. Enron Canada Corp.*, 349 F.3d 816, 822 (5th Cir. 2003) ("When interpreting a contract, the question is what was the parties' intent, because courts are compelled to give effect to the parties' intentions").

Abbott's fundamental problem in this case is that the National Marketing and Distribution Agreement states that the parties "may" resolve their disputes using the ADR procedure set out in Exhibit 12.2.  Certainly, however, "may" does not always mean "shall."  In fact, "may" most often is a term used to connote an option and is typically a permissive term.  *See, e.g., Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex. App.—Austin 1996, writ denied).  "The word 'may' [in a contract] means possibility, permission, liberty or power; it does not indicate a mandatory requirement." *Id.*  As the United States Supreme Court has pointed out, "[t]he word 'may' customarily connotes discretion." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005).  "The connotation [of discretion] is particularly apt where, as here, 'may' is used in contraposition to the word 'shall.'" *Id.*

Thus, the question before the court was not whether "may" can sometimes mean "shall" so that the court could automatically adopt that meaning for the word

"may" in this context.  The task before the court was to find the parties' intent as they had expressed it in their writing.  And, in that writing, the parties chose the word "may," which most frequently connotes permission, not a mandatory requirement.

The fact of the matter is that the rules of contract construction are not so myopic as Abbott suggests.  Instead, courts examine a number of matters in connection with determining the meaning of the parties' language.  *See* Mark K. Glass & Keith A. Rowley, *On Parol: The Construction and Interpretation of Written Agreements and the Role of Extrinsic Evidence in Contract Litigation*, 49 Baylor L. Rev. 657 (Summer 1997).

    *1.*    *Contracts Signed As A Part Of The Same Transaction Should Be Construed Together*

One rule of construction applicable to this case is that a document is to be construed with the other documents that were signed as a part of the same transaction.  When documents are executed "at the same time, with the same purpose and in the course of the same transaction" the court must "construe the agreements together."  *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1412 (5th Cir. 1993); *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) ("agreements executed at the same time, with the same purpose, and as part of the same transaction, are construed together"); *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984) (same).  Furthermore, courts

consider the other documents in determining *whether* there is an ambiguity.  *See Tower Contracting Co. v. Flores*, 302 S.W.2d 396, 398 (Tex. 1957).  "In deciding whether the [contract] is ambiguous" the court considers other documents executed in the course of the same transaction.  *Law Office of C. Kendall Harrell v. Commerce Sav. Ass'n*, 824 F.Supp. 1159, 1181 (W.D. Tex. 1993).

Abbott barely mentions this rule, one of the most basic rules of contract construction.  Appellant's Brief at 37-38, n. 4.  In a single footnote, it mentions that the other agreements exist, but then encourages this Court to ignore any differences between this agreement and those other three agreements.[3]  *Id.*

In this case, the parties signed four agreements as a part of the same transaction.  They signed the National Marketing and Distribution Agreement, the Registration Rights Agreement, the Credit Agreement, and the Security Agreement.  Those agreements demonstrate that the parties (1) were choosing language that was very specific for each of their different dispute resolution clauses, and (2) were drafting dispute resolution provisions that varied from one agreement to the next.  The parties were not taking a uniform approach to ADR in their agreements.

---

[3] Ironically, Abbott does embrace the concept that different documents must be read together in another portion of its brief addressing two orders issued by the district court on the same day.  Appellant's Brief at 6 n. 1.  When it comes to the construction of the Agreement at the heart of this case, however, Abbott virtually ignores this principle.

None of the other agreements contain the same language that the parties included in the National Marketing and Distribution Agreement. Instead, for example, there is no arbitration agreement at all in the Security Agreement. Ex 30; Tr:209. On the other hand, the Registration Rights Agreement and the Credit Agreement both make arbitration mandatory. In fact, the Registration Rights Agreement uses virtually the same language that Abbott had first suggested for the National Marketing and Distribution Agreement, but which was ultimately rejected.[4] The Credit Agreement provides that "Disputes <u>shall</u> be resolved as provided in Annex B attached hereto." Ex 31, ¶12.9 (RTI 1861) (emphasis added); Tr:209. "Annex B" provides for an arbitration process. Ex 31, Annex B (RTI 1866-68).

Plainly, the parties were dealing with arbitration on an individual basis, depending on the particular agreement involved. For certain agreements, arbitration was mandatory and they used the word "shall" to state that they were required to arbitrate. For one agreement, there was no arbitration provision. And in the National Marketing and Distribution Agreement, it was stated that the parties "may" arbitrate according to the procedure attached as Exhibit 12.2. The existence

---

[4] *Compare* Ex 29, ¶4.4 (RTI 1811) (Registration Rights Agreement stating disputes "shall be resolved by binding Alternative Dispute Resolution ("ADR") in the manner described in **Annex B** to the Credit Agreement"), *with* Ex 10, ¶10.2 (RTI 638) (original Abbott draft of National Marketing and Distribution Agreement stating "such disputes shall be resolved by binding Alternative Dispute Resolution ("ADR") in the manner described in Exhibit 10.2").

of very similar clauses in other agreements—particularly the Registration Rights Agreement—but which use the word "shall" and "binding" as opposed to "may" strongly indicates that the parties were attempting to accomplish something different in the National Marketing and Distribution Agreement. Under this circumstance, one cannot—in determining the parties' intent—conclude as a matter of law that they were attempting to make arbitration mandatory (as Abbott insists).

On this basis alone, the district court was thoroughly justified in conducting the preliminary trial. After observing that the parties were carefully choosing different approaches to ADR depending on the particular agreement—sometimes making ADR mandatory, sometimes not having ADR at all—it is fair to ask whether the word "may" actually meant to call for mandatory arbitration (as opposed to an option to arbitrate). Because the parties had—twice—used the word "shall" in agreeing to mandatory ADR, it is proper to ask whether they would actually choose the word "may" to also agree to mandatory ADR. After examining the other agreements, it is apparent that "may" could cause the National Distribution and Marketing Agreement to reasonably have more than one interpretation. Thus, the district court acted correctly in conducting the preliminary trial on the contract's meaning.

2.     *Courts Should Also Look At The Circumstances Surrounding The Formation Of The Agreement When Interpreting Contractual Language*

The district court did not have to look at anything beyond the other three agreements to see that the ADR provision in the National Marketing and Distribution Agreement was at least ambiguous. The parties' use of the word "shall" in two other ADR provisions in that same transaction raised the reasonable possibility that the use of "may" in this ADR provision meant to convey an option and not a mandate. Nevertheless, there are additional reasons that the district court was correct to conclude that the ADR provision was ambiguous and to conduct the preliminary trial.

"In determining whether a contract is ambiguous, [the court] look[s] to the contract as a whole, in light of the circumstances present when the contract was executed." *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627 (Tex. App.— Houston [14th Dist.] 2006, pet. denied). "In construing the contract, we consider how a reasonable person would have used and understood the language, by pondering the circumstances *surrounding the contract's negotiation*, and by considering the purposes which the parties intended to accomplish by entering into the contract." *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) (emphasis added).

Courts normally look at surrounding circumstances in conjunction with the first step in the construction process: determining whether the contract is

28

unambiguous, or whether there are multiple reasonable meanings. This Court and the Texas Supreme Court have repeatedly reviewed surrounding circumstances at this initial stage. *See, e.g., Crisalli v. ARX Holding Corp.*, 177 Fed. Appx. 417, 2006 WL 1049122 at **3 (5th Cir. April 20, 2006) ("district court did not err in looking to extrinsic custom and usage evidence" in determining whether there was an ambiguity); *Sw. Bell Tel. v. Pub. Util. Comm. of Texas*, 208 F.3d 475, 486 (5th Cir. 2000) ("Beyond the four corners of the parties' agreement, their intent may be evidenced from the surrounding facts and circumstances when the contract was entered"); *Hanssen v. Qantas Airways Ltd.*, 904 F.2d 267, 269 (5th Cir. 1990) ("A Texas court will deem a contract unambiguous when it is reasonably open to just one interpretation given the rules of interpretation and the surrounding circumstances."); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) ("Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered."); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (same as above); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 n. 5 (Tex. 1981) ("the contract in any event had to be appraised in view of the surrounding circumstances known to the parties at the time of its execution . . . even though the contract [was] not deemed ambiguous").

Thus, there is no question that courts should look at the surrounding circumstances that existed at the time of the contract's execution to determine whether the contract is ambiguous or unambiguous.

3.  *Examining The Surrounding Circumstances Includes An Examination Of The Parties' Negotiations*

Also, in addition to the need to look at other contracts signed as a part of the same transaction, Texas law permits the examination of the parties' <u>negotiations</u>. "We are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties. . . ." *Cook Composites*, 15 S.W.3d at 132. "We look to these circumstances merely to assist us in understanding the object and purpose of the contractual language the parties chose." *Id.* This is a rule that has long existed in Texas. *See, e.g., Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 n. 5 (Tex. 1981) (in construing an unambiguous instrument, court can examine surrounding circumstances including negotiations); *Carr v. Christie*, 970 S.W.2d 620, 623 n.2 (Tex. App.—Austin 1998, pet. denied). This rule was adopted in Texas courts from Williston on Contracts and the Restatement of Contracts:

> There must always be an association between words and external objects, and no matter how definite a contract may appear on its face, 'words must be translated into things and facts.' Thus . . . *the contract in any event had to be appraised in view of the surrounding circumstances known to the parties at the time of its execution and these reasonably could be looked to without violating the parol evidence rule even though the contract were not deemed ambiguous.* In interpreting contracts or clauses set forth in 'clear and unambiguous' language, the courts do not confine themselves to a mere inspection of the document. Before committing themselves, *the*

30

> courts carefully examine the surrounding circumstances, *prior negotiations,* and all other relevant incidents bearing on the intent of the parties.

*Sun Oil Co.*, 626 S.W.2d at 731 n.5 (emphasis added; quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex. 1968), quoting, in turn, RESTATEMENT OF CONTRACTS §230 (1932) and WILLISTON ON CONTRACTS §609 (3rd ed. 1961)).

The "surrounding circumstances" placed before the district court were these: the parties started with a draft from Retractable that had no provision for arbitration. Abbott then sent a draft of the Agreement that provided for mandatory arbitration, using the word "shall." In a subsequent draft, Retractable removed all language regarding arbitration and Abbott then added the arbitration language back again using the word "shall." Following that, the drafts included a provision for ADR, but with a statement that disputes "may" be resolved by submission to ADR. The parties also removed the word "binding" from the arbitration provision.

Thus, the National Marketing and Distribution Agreement did not just "happen" to contain the word "may" in its arbitration provision. Instead, that was a term that was the subject of considerable negotiations. After a significant back-and-forth and when the parties finally added an ADR provision, they substituted the word "may" for "shall." It is apparent that the parties attached a meaning to the change of the word "shall" to "may." "May" did not mean the same thing as

"shall" to the parties. Yet, the allegedly unambiguous meaning that Abbott would attach to the word "may" is that it would have the same meaning as the word "shall."

At the preliminary trial on the question of whether the parties agreed to a mandatory arbitration, additional evidence was adduced regarding the negotiations and the surrounding circumstances. Retractable's President Shaw had informed Abbott's representatives that arbitration was unacceptable to him. Tr:135, 191, 247. One of the witnesses for Abbott testified (1) that Abbott's management would not sign off on an agreement that did not have a provision for ADR and (2) that he told Retractable that the agreement had to contain an ADR provision. Tr:93-94. Representatives for Retractable told Abbott that Shaw would not agree to mandatory arbitration, but that he would agree to a provision that allowed for arbitration if both sides agreed. Tr:140, 195-96. It was at this time that the ADR provision remained in the Agreement, but the language changed from "shall" to "may."

Abbott would have the Court ignore this history behind the parties' change of the word "shall" to "may" in the ADR provision. It would have the Court ignore the fact that the word "shall" is different from the word "may." It would only have this Court look at the word "may" and conclude—whatever the parties may have intended—that the word "may" invariably means "shall" when used in a

clause providing for ADR. Texas law does not support such a blind, and ultimately unfair, approach to contract construction.

     *4.     This Case Does Not Involve The Parol Evidence Rule*

     One of the fundamental flaws in Abbott's briefing is that Abbott views the parol evidence rule as being a restriction on the introduction of all extrinsic evidence. Generally, Abbott treats statements restricting the use of parol evidence as a restriction on extrinsic evidence. *See, e.g.,* Appellant's Brief at 34-38. Thus, Abbott confuses distinctly different principles.

     The parol evidence rule is not a general ban on the use of extrinsic evidence. Generally speaking, the parol evidence rule "precludes consideration of extrinsic evidence to *contradict, vary or add to* the terms of an unambiguous written agreement." *Bank of Am. N.A. v. Haag*, 37 S.W.3d 55, 57 (Tex. App.—San Antonio 2000, no pet.) (emphasis added). "[T]he [parol evidence] rule precludes the enforcement of *inconsistent prior or contemporaneous agreements*." *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 31 (Tex. 1958) (emphasis added); *see also Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 744 (Tex. App.—Dallas 1990, writ denied) ("when contracting parties have concluded a valid integrated agreement dealing with the subject matter between them, the parol evidence rule will prevent enforcement of prior or contemporaneous agreements which are inconsistent with the integrated agreement"); Mark K. Glass & Keith A. Rowley, *On Parol: The Construction and Interpretation of Written Agreements*

*and the Role of Extrinsic Evidence in Contract Litigation*, 49 Baylor L. Rev. 657, 706 (Summer 1997) (the parol evidence rule does not "bar proof of understandings offered for a purpose other than to vary or contradict" the written agreement).

The parol evidence rule is not an issue in this case. Retractable is not attempting to enforce inconsistent prior or contemporaneous agreements. Nor is Retractable attempting to contradict, vary, or add to the Agreement at issue. Instead, the problem is the question of whether the parties used the word "may" in its usual, permissive sense; or whether they intended something else. This is not a parol evidence problem.

5.    *The Court's Ability To Examine Certain Extrinsic Evidence Is Not Affected By The Integration Clause*

The fact that the National Marketing and Distribution Agreement has an integration provision merely ties back into the parol evidence rule: no one can use evidence that would add to, contradict, or vary the terms of the agreement. *See* Appellant's Brief at 38 (arguing that the integration clause prevented the district court from considering evidence of surrounding circumstances and prior negotiations).

The fact that the parties have agreed to an "integrated" contract simply means that they have reduced their final agreement on one or more points to writing. According to the Restatement, "[a]n integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement."

34

RESTATEMENT (SECOND) OF CONTRACTS §209(1) (1981). Likewise, "a completely integrated agreement is an integrated agreement adopted by the parties as a complete and exclusive statement of the terms of the agreement." *Id.* §210(1). In the National Marketing and Distribution Agreement, the parties had a merger provision that stated the agreement was their entire agreement. Ex 28, ¶12.7 (ABB 1461).

The effect of a "completely integrated agreement" is simply that the parol evidence rule applies to it. "When parties have concluded a *valid integrated agreement* . . ., the [parol evidence] rule precludes the enforcement of inconsistent prior or contemporaneous agreements." *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 31 (Tex. 1958) (emphasis added).

Thus, the Agreement's merger clause merely means that the parol evidence rule would apply to preclude any attempts to contradict, vary, or add to the terms of the agreement. It has nothing to do with extrinsic evidence used to construe or interpret the Agreement. Rather, "the interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings *in the light of the circumstances*. . . ." RESTATEMENT (SECOND) OF CONTRACTS §212(1) (1981) (emphasis added). As the Restatement makes clear, this rule "*permits reference to the negotiations of the parties*, including statements of intention and even positive promises, so long as they are used to show the meaning of the writing."

RESTATEMENT (SECOND) OF CONTRACTS §212, cmt c (1981) (emphasis added); *see also* RESTATEMENT (SECOND) OF CONTRACTS §214, (1981) (stating that "[a]greements and *negotiations* prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated. . . .") (emphasis added).

> 6. *In Sum, The District Court Acted Correctly In Looking At The Other Contracts, The Surrounding Circumstances, And The Parties' Negotiations, And In Determining That The ADR Provision Was Ambiguous*

The district court did exactly what it should have done and it arrived at the correct conclusion. The Agreement was ambiguous. Thus, the court acted correctly in conducting the preliminary hearing pursuant to the terms of 9 U.S.C. §4 and in hearing evidence regarding the parties' intent.

The parties had selected the word "may" with regard to whether their disputes had to be arbitrated. This was different from two other agreements that they had signed on the same day that used the word "shall" with regard to arbitration. The parties had traded drafts of the National Marketing and Distribution Agreement back and forth, finally changing the word "shall" to "may." They also removed the word "binding." Testimony showed that this was a compromise between Abbott's desire to arbitrate all disputes and Retractable's desire to always go to court.

The question before the district court was whether "the contract [was] subject to two or more reasonable interpretations after applying the pertinent rules of construction." *J. M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (court considers whether "the language of the contract is subject to two or more reasonable interpretations or meanings"); *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996) (courts examine whether contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed. . . ."). If the answer to the question is "yes" and the contract is subject to two or more reasonable interpretations, then it is ambiguous. *Id.*

Here, it is certainly—at the very least—a *reasonable* interpretation that "may" was used to connote that arbitration was not mandatory: that arbitration would be optional, and that the parties would have to agree to arbitration at the time that the dispute arose. That meaning flows from the choice of the word "may," from the fact that the parties made other agreements subject to mandatory arbitration, and that they had deliberately (after negotiations) changed the word "shall" to "may," indicating that they were attempting to inject some material change in their agreement.

Thus, assuming that Abbott's interpretation that "may" could also mean "shall" in the context of an arbitration provision and under these circumstances, there were a minimum of two reasonable interpretations for the provision before the district court.

If there are at least two reasonable interpretations, the contract is ambiguous and there is a fact issue as to the parties' intent. *J. M. Davidson*, 128 S.W.3d at 229; *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). At that point, the parties can introduce evidence as to their intent. *Id.*

The district court used a process that was entirely correct. The evidentiary record fully supports the district court's findings and conclusions that the parties did not agree to a mandatory arbitration and that Abbott cannot force Retractable to arbitrate. Abbott does not dispute the evidence, the findings, or the conclusions from the preliminary hearing. Instead, it merely argues that the agreement unambiguously mandated that the parties arbitrate and that the district court should not have concerned itself with the truth about what the parties intended. For the many reasons set out above, Abbott's argument is wrong.

**F.    None Of Abbott's Authorities Change The Result That The National Marketing and Distribution Agreement Is Ambiguous And The District Court Was Correct In Concluding That It Did Not Require The Parties To Arbitrate**

Abbott's contention in this appeal and in the court below is that there are allegedly a number of cases that have construed "may" effectively to mean "shall"

in arbitration provisions and that "may" unambiguously means "shall" when used in an arbitration provision. *See* Appellants' Brief at 25-31. No matter what the parties said in their other documents, no matter that the parties purposefully changed the word "shall" to "may," no matter what the parties were attempting to achieve in their negotiations, "may"—according to Abbott—always means "shall" in an arbitration provision. Thus, according to Abbott, even if the parties were attempting to create a voluntary arbitration process through their use of the word "may," no court should recognize that attempt or permit the parties their freedom of contract and should instead impose mandatory arbitration on the parties.

Abbott's arguments are wrong and its cases do not provide the support that Abbott claims.

1.    *None Of Abbott's Cases Involve Situations Where The Parties Changed The Word "Shall" To "May"*

None of Abbott's cases discuss the surrounding circumstances that are present in this case. None of those cases involve situations where it was shown that the parties began with an agreement stating that disputes "shall" be resolved by ADR, which was changed to state that disputes "may" be resolved by ADR. In Abbott's cases, the parties simply argued for different meanings, but without demonstrating the circumstances surrounding the negotiations.

Here, the parties negotiated for the word "may" and substituted it for the word "shall." Plainly, they were trying to accomplish something with that change. Abbott fundamentally seeks to ignore that truth.

Abbott's cases lack the circumstances that existed here. Here, the parties had a sharp disagreement on whether there should be any arbitration procedure. Abbott said that its management would not sign off on an agreement that did not contain ADR; Retractable's president, Shaw, refused to agree to arbitrate. So the parties worked out a compromise. Abbott's draft, which provided disputes "shall" be resolved by ADR changed to the final version, where disputes "may" be resolved by ADR. The district court concluded that the parties intended to create an *option* to choose ADR if they both wanted to do so at the time of a dispute.

What Abbott seeks to achieve in this Court is the very result that it failed to achieve in its negotiations with Retractable. It seeks to force a mandatory arbitration when that was the very object of the compromise that the parties reached in order to allow the underlying transaction to go forward.

This problem was not present in the cases that Abbott cites. Abbott's cases did not involve a situation where the courts interpreted the arbitration provision in contradiction to the parties' proven intent. Here it was shown both from the surrounding circumstances and the testimony regarding intent that the parties used the word "may" to have the meaning typically applied to it to connote permission

or discretion, not something mandatory.  *See Jama*, 543 U.S. at 346; *Nalle*, 914 S.W.2d at 687.

### 2. *The ADR Provision Here Has Meaning If The Provision Is Voluntary*

One of Abbott's themes is that, unless the ADR provision is mandatory, it is meaningless.  *See* Appellant's Brief at 19-21, 27, 31.  Here, however, the concept of a voluntary arbitration appears to fit precisely within what the parties were attempting to achieve in their agreements that formed a part of this transaction.

Arbitration clauses frequently, if not most usually, simply express a desire to arbitrate disputes.  They may specify a few particulars, such as that the rules of the American Arbitration Association will apply, or that there will be one arbitrator or three.  But the details generally are sparse, allowing the parties to craft the arbitration that best fits the situation.

That is not true with the ADR provision at issue.  Here, the ADR provision is accompanied by a detailed procedure that spells out precisely how the arbitration will take place if one takes place.  The arbitration is strictly limited in terms of time, discovery, and allowed length of presentation.  It is the kind of arbitration that will work for small disputes—not for large ones.

That matches the testimony at the preliminary trial.  One of Retractable's witnesses testified that the parties had come up with the compromise precisely with the idea in mind that they would have the option of arbitrating small disputes, but would leave open the option of going to court.  Tr:136.  Thus, the witness testified

that "I just remember sometime during that meeting we came up with this idea . . . [that] we can go to arbitration on like . . . a production delay or something small, but we have to be able to have the choice to go to court." *Id.* "And so that's where my recollection is that we talked about the word shall and may. . . ." *Id.*

The National Marketing and Distribution Agreement left it open and permissive as to whether disputes would be submitted to arbitration. That makes sense given the particular agreement. The National Marketing and Distribution Agreement could possibly give rise to small disputes that would make a 10-hour, no-discovery arbitration a reasonable option. On the other hand, that Agreement could also give rise to much larger disputes, such as the dispute in this case, about general across-the-board breaches. In such a situation, a truncated arbitration proceeding, without assistance of any discovery, would not make sense.

So the permissive ADR situation that the parties created for the National Marketing and Distribution Agreement was part of a planned approach to the parties' potential breadth of disputes. The fact that the parties left the ADR decision to be determined by agreement at the time of the dispute does not make that provision "meaningless." Instead, it gives meaning to the flexibility that the parties attempted to build within the Agreement to allow a particular, limited kind of ADR proceeding if it made sense at the time, but not to require it.

Although Abbott expresses great concerns that the ADR provision might be rendered meaningless, the far greater concern here is whether the parties' very precise approach to ADR will be overridden.  The trade off here is that if one goes out of one's way to give a strong and definite "meaning" to the ADR provision (by forcing the parties to arbitrate when they agreed that it be optional), it will deprive the parties' negotiations of any meaning.  Nowhere is it said in any case discussing arbitration that arbitration is more important than freedom of contract.  In fact, cases say that arbitration depends on the parties' agreement, which flows from their freedom of contract.  *Waffle House*, 534 U.S. at 294; *Will-Drill*, 352 F.3d at 214 *Fleetwood Enters.*, 280 F.3d at 1073.  Here, however, Abbott attempts to promote arbitration by fundamentally squelching the parties' freedom of contract.

There is no reason that parties cannot contract to make ADR an option to be agreed upon at the time the dispute arises.  Certainly, courts have recognized that parties sometimes draft agreements that make arbitration optional and they enforce those agreements as written.  *See, e.g., Buck Consultants, Inc. v. Glenpointe Assoc's,* 217 Fed Appx. 142, 147 n.7 (3d Cir. 2007) (noting that the lease at issue "provided the option, but did not require, that the parties may arbitrate their disputes" and concluding that court action was proper); *Young Brothers, Ltd. v. Int'l Longshore and Warehouse Union, Local 142*, 250 F. Supp. 2d 1244, 1249-50 (D. Hawaii 2003) (concluding that the employer had the option to, but was not

43

required to arbitrate); *Morello v. Federal Barge Lines, Inc.*, 575 F. Supp. 87, 91 (D.C. Mo. 1983) (contract did not require mandatory arbitration by either party), *aff'd*, 746 F.2d 1347, 1351 (8th Cir. 1984). That is simply what the parties did here: in one of their agreements, they made arbitration voluntary.

> 3.   *Most Of Abbott's Citations Involve Labor Relations, Collective Bargaining Agreements, Relations With Unions, And Similar Matters*

Of course, the object of 9 U.S.C. §4 is to make sure that the parties have agreed to arbitrate. They will not be forced to arbitrate without such an agreement. And, at this juncture, the presumptions in favor of arbitration do not apply. *Waffle House*, 534 U.S. at 294; *Will-Drill*, 352 F.3d at 214; *Fleetwood Enters.*, 280 F.3d at 1073. These are the overriding principles that apply to this case.

Most of the cases that Abbott argues in support of "may" meaning "shall" arise in the labor context. *See, e.g., United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960) (suit by union to compel arbitration of grievance); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875 (4th Cir. 1996) (concluding that employee had standing under collective bargaining agreement to arbitrate after being discharged); *Atkins v. Louisville and Nashville R.R. Co.*, 819 F.2d 644, 645 (6th Cir. 1987) (interpretation of New York Dock Conditions created to protect certain railway employees); *Ceres Marine Terminals, Inc. v. Int'l Longshoremen's Assoc., Local 1969*, 683 F.2d 242 (7th Cir. 1982) (interpreting collective bargaining agreement); *United SteelWorkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273

(3d Cir. 1979) (action by union construing collective bargaining agreement); *Local 771, IATSE, v. RKO Gen'l, Inc.*, 546 F.2d 1107 (2d Cir. 1977) (union brought action seeking to compel arbitration of labor dispute); *Nemitz v. Norfolk and W. Ry. Co.*, 436 F.2d 841 (6th Cir. 1971) (action by members of union); *Deaton Truck Line, Inc. v. Local Union 612*, 314 F.2d 418 (5th Cir. 1962) (action by union to arbitrate under collective bargaining agreement).

The fact that so many of Abbott's cases are grounded in labor law is extremely important to those decisions. The Supreme Court case that Abbott cites, *United Steelworkers*, 363 U.S. 564, was one of a trio of cases that the Supreme Court handed down at the same time in 1960. In those cases, the Supreme Court drew a distinction between arbitrations in the labor context and in a commercial setting. "In the commercial case, arbitration is the substitute for litigation." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960). "Here arbitration is the substitute for industrial strife." *Id.* "[A]rbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." *Id.* As the Supreme Court later observed, the precepts set out in its trilogy of *Steelworkers* cases "have served the industrial relations community well, and have led to continued reliance on arbitration, rather than strikes or lockouts, as the preferred method of resolving disputes arising

during the term of a collective bargaining agreement." *AT&T Technologies, Inc. v. Commun. Workers of Am.*, 475 U.S. 643, 648 (1986).

The *Steelworkers* trilogy created a presumption in favor of arbitration in the labor setting. *See Warrior & Gulf*, 363 U.S. at 582-83. Based on the requirements of the Labor Management Relations Act and the fact that arbitration (rather than strikes) were the desired end point of a disagreement, the Court required that all "doubts should be resolved in favor of" arbitration. *Id.* at 583. The Court held that, in the labor setting, arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 582-83. As the Court later noted, "This presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements, furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining." *AT&T Technologies*, 475 U.S. at 650.

Nevertheless, however, even in the labor-relations context, there are limits on courts' ability to engage in presumptions in favor of arbitration. More recently, the Supreme Court has pointed out that the presumption "does not extend beyond the reach of the principal rationale that justifies it, which is that arbitrators are in a better position than courts to interpret the terms of a [collective bargaining

agreement]." *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 78 (1998). The presumption favoring arbitration, however, had no reason to exist with regard to statutory claims. As a result, the Supreme Court concluded that "[n]ot only is [a] statutory claim not subject to a presumption of arbitrability; we think any [collective bargaining agreement] requirement to arbitrate [a statutory claim] . . . must be particularly clear." *Id.* at 79.

Thus, it is labor arbitration principles that govern many of Abbott's cases. For example, in *Ceres*, the Seventh Circuit observed early in its opinion that "even where a collective bargaining agreement is ambiguous regarding the effect of its arbitration provisions, doubts should be resolved in favor of arbitration." *Ceres Marine Terminals*, 683 F.2d at 244. It ends with the conclusion that "doubts must be resolved in favor of arbitration." *Id.* at 248. The opinion relies heavily on the fact that it is being written with respect to a collective bargaining agreement.

This Court was addressing these kinds of labor disputes in its opinion in *Deaton Truck Line, Inc. v. Local Union 612*, 314 F.2d 418 (5th Cir. 1962). That case dealt with a request to arbitrate "two labor disputes or grievances." *Id.* at 420. There, the grievance procedure contained in the collective bargaining agreement stated that "If the Union and the Company fail to agree, the disputes may be submitted to the arbitration and the decision of the arbiter shall be final. . . ." *Id.* at 421. Under the authority of the recent *Steelworker* cases admonishing that

arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" this Court held that "may" should be construed to give either aggrieved party the option to require arbitration. *Id.* at 422; *Warrior & Gulf*, 363 U.S. at 582-83. That conclusion flows from the presumptions that apply in the labor context.

Even Abbott's cases that do not involve collective bargaining procedures and union grievances rely on the cases that arise in the labor context. *See Am. Italian Pasta Co. v. The Austin Co.*, 914 F.2d 1103, 1104 (8th Cir. 1990) (relying on union cases); *Zars, Inc. v. LTS Lohmann Therapy Sys. Corp.*, No. 2:05-CV-198-TC, 2006 WL 2992719 at *1, 3 (D. Utah Oct. 18, 2006) (in interpreting an agreement *governed by German law*, the court cited cases that relied upon the holdings of these labor cases); *New York Cross Harbor R.R. Terminal Corp. v. Consolidated Rail Corp.*, 72 F. Supp. 2d 70, 76-77 (E.D.N.Y. 1998) (relying on labor cases); *Block 175 Corp. v. Fairmont Hotel Mgmt. Co.*, 648 F. Supp. 450, 452 (D. Colo. 1986) (relying on *Held*); *Held v. Nat'l R.R. Passenger Corp.*, 101 F.R.D. 420, 424 (D.D.C. 1984) (relying on labor decisions).

The problem with the approach in these cases was the subject of the dissent in *American Italian Pasta Co.*, 914 F.2d at 1104-06. In fact, the majority opinion in *American Italian Pasta* (relying on labor decisions) was little more than a page long; the dissent was nearly twice as long. As the dissent pointed out, one of the

majority's authorities was "a labor case that does not necessarily translate into every case with an arbitration clause." *Id.* at 1105 n.2. Similarly, the dissent noted that this Court's decision in *Deaton* involved "a labor union, an employer, and a collective bargaining agreement." *Id.*

The differences between commercial and labor arbitrations are very important. In the commercial setting, the Supreme Court has recently emphasized that courts look to the parties' agreement, "not to general policy goals," to determine whether there is an agreement to arbitrate. *Waffle House*, 534 U.S. at 294. And this Court has stressed that the "*federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties. . . .*" *Fleetwood Enters.*, 280 F.3d at 1073 (emphasis added). This differs greatly from the presumptions that accompany arbitration with collective bargaining agreements.

4.    *Many Of Abbott's Cases Involve Arbitration Provisions To The Effect That Either Party May Refer The Case To Arbitration*

The language used in many of Abbott's cases is different from the language of the ADR provision at issue. This difference explains Abbott's pronounced attempt to effectively incorporate the exhibit providing for the ADR *procedures* into the basic ADR provision itself.

In many of Abbott's cases, the critical word "may" appeared in a sentence that stated something like: "either party may refer" the dispute to arbitration. *See*

*Atkins*, 819 F.2d at 647 (dispute "may be referred by either party to an arbitration committee"); *Local 771, IATSE*, 546 F.2d at 1115 (parties "may" submit to arbitration . . . upon written request of either party"); *Zars*, No. 2:05-CV-198-TC, 2006 WL 2992719 at *1 ("either party may submit such dispute for arbitration"); *New York Cross Harbor*, 72 F. Supp. 2d at 76 ("either party may . . . refer any dispute . . . to arbitration"); *Block 175 Corp.*, 648 F. Supp. at 451 ("either party may serve upon the other a written notice stating that such party desires" arbitration); *Held*, 101 F.R.D. at 423 ("either party may refer the dispute to the Secretary of Labor for determination").

When "may" is used as a part of the phrase stating "either party may" refer the case to arbitration, it conveys the sense that either party may commence the arbitration proceeding. The phrase does not convey that arbitration is necessarily optional.

The situation—and the contractual language—before this Court is very different from the language in these cases. Here, the agreement was that disputes "*may* be resolved by ADR in the manner described in Exhibit 12.2." That is the basic agreement itself. There is no statement that either party may force the other to arbitrate. Separately, there is a lengthy procedure outlining how that ADR proceeding would take place. In that four-page agreement on the particular procedures to be used, it states that "either party may initiate an ADR proceeding

as provided herein" to signify that if the parties agree to resolve their disputes through the ADR process, either party may initiate the proceeding. But one would only turn to that procedure if the parties first agreed to arbitrate their particular dispute.

Abbott goes out of its way to conflate the agreed-upon procedure of Exhibit 12.2 with the basic ADR provision. It repeatedly refers to the procedural language that "either party may initiate" the proceeding (found only in the procedure exhibit) as if it were a part of the basic agreement that disputes "may" be resolved by ADR. Thus, for example, Abbott states that "*[t]he arbitration clause in the NMDA expressly states* that if a matter in dispute cannot be resolved within a given period of time through negotiations of the parties' respective presidents, *'either party may initiate an ADR proceeding as provided herein*.'" Appellant's Brief at 14 (emphasis added). That, simply put, is not what the "arbitration clause" states. Abbott is plucking language out of context from the separate procedural exhibit to effectively change the ADR provision in a manner that is more favorable to Abbott. The reason that it must do so is to better fit this case within the authorities that Abbott cites. Clearly, Abbott is not comfortable with the ADR provision as written, which is why it is attempting to rewrite it on appeal.

In the end, this case simply does not fit within the language or the holdings of many of the cases that Abbott cites.

5. *Cases Also Hold That "May" Makes Arbitration Permissive, Particularly When The Parties Specifically Chose To Use The Word "May" As Opposed To The Word "Shall"*

Abbott's chief argument on appeal is that, supposedly, all federal courts interpreting the word "may" in an arbitration provision governed by the Federal Arbitration Act have allegedly found that it gives either party the "right" to compel arbitration. Appellant's Brief at 22. As can be seen from the discussion above, Abbott's cases are not nearly as solid as Abbott claims. In fact, if one removes from Abbott's list of cases both (1) the cases decided in the labor context and (2) the cases that are interpreting agreements that "either party may" commence arbitration, there is only one case left: *American Italian Pasta Co.*, 914 F.2d 1103. That is the case in which the dissent pointed out that the majority should not be relying on labor cases in arriving at its decision. The dissent would have concluded that the parties did not agree to compulsory arbitration. 914 F.2d at 1106. Moreover, *American Italian Pasta* did not involve contemporaneous agreements or other surrounding circumstances showing that arbitration was to be optional.

Beyond that, however, not every court agrees that "may" should be read as "shall" in an arbitration provision. For example, the Fourth Circuit had before it a situation in which the Company and the Union had mirror provisions stating that they "may" invoke arbitration. *Lynchburg Foundry Co. v. Patternmakers League of N. Am.*, 597 F.2d 384, 386 (4th Cir. 1979). The agreement stated that the

company "may" request the American Arbitration Association to appoint an arbitrator; it also provided that the union "may" invoke arbitration at the end of a grievance proceeding. *Id.* The union argued that arbitration was mandatory. The court noted that "[t]he union's argument boils down to the contention that the word 'may' means 'shall.'" *Id.* at 387. The court concluded that the parties had the option to arbitrate, but that they were not required to do so. *Id.* at 387-88.

In another case, the collective bargaining agreement provided that employees were required to follow a grievance procedure that required arbitration. *Young Brothers, Ltd. v. Int'l Longshore and Warehouse Union, Local 142*, 250 F. Supp. 2d 1244, 1249 (D. Hawaii 2003). The agreement did not require the company to do likewise, however. *Id.* Instead, it stated that the company "may" institute arbitration. *Id.* The union argued "that 'may' could mean 'shall' or 'must' in the proper context." *Id.* The court rejected that argument, holding "that the word 'may' means that [the company] has the option to arbitrate." *Id.* at 1250.

The case that is the closest to this one is *A. Dubreuil and Sons v. Town of Lisbon*, 577 A.2d 709, 710-711 (Conn. 1990). In that case, the parties had started with the standard American Institute of Architects contract on a construction project. As with Abbott's initial draft of the National Marketing and Distribution Agreement, the standard form contract in *Dubreuil* provided that all disputes "*shall* be decided by arbitration. . . ." *Id.* at 711 (emphasis in original). The defendant,

however, requested that the contract be amended to read that all disputes "*may* be decided by arbitration. . . ." *Id.* (emphasis added).

The Connecticut Supreme Court stated that to compel arbitration after such a change was made would render that change "meaningless." *Id.* Indeed, the court stated that "[t]he deliberate substitution of 'may' for 'shall' in the arbitration provision of the contract . . . is an indication that the parties expressly intended something other than mandatory arbitration." *Id.* at 713. The Court further said:

> Because the command word "shall" was deliberately removed from the contract by the parties and replaced by the word "may," it was not unreasonable for the trial court to have determined that the parties intended to modify their contract to provide *for consensual rather than mandatory arbitration.*

*Id.* (emphasis added). That court held that the parties' intent was a factual question and that the trial court findings of fact could not be reversed on appeal absent a showing that they were clearly erroneous.

Abbott attempts to distinguish *Dubreuil*. For one thing, it again relies upon the language in the separate ADR procedure to claim that, here, the parties agreed that "either party may initiate" arbitration—as if that were a part of the basic ADR provision itself (which it is not). Appellant's Brief at 41. Second, Abbott pleads the "don't look" distinction. Appellant's Brief at 40-41. It argues that the *Dubreuil* contract itself showed that the arbitration provision was changed from "shall" to "may." Thus, the *Dubreuil* court *had to* observe that the change was made. Here, according to Abbott, because the fact of the change does not appear

on the face of the final Agreement, this Court supposedly is free to ignore the fact that a change was made. Abbott essentially argues that this Court should purposefully overlook the surrounding circumstances and, if the Court does so, it might perceive a difference between this case and *Dubreuil* that does not actually exist.

Finally, Abbott attempts to argue that *Dubreuil* is limited because a subsequent lower court decision did not feel that it applied to the facts before it. Appellant's Brief at 41-42; *see Lee v. Pathology Assoc. & Consultants, P.C.*, 2003 WL 22133954 (Conn. Super. Ct. Aug. 26, 2003). That case, however, had language that was more akin to cases in which the parties agreed that "either party may" request arbitration. More recently, another Connecticut court applied the *Dubreuil* holding in a situation wherein the arbitration provision stated that disputes "may be submitted to a board of arbitrators." *FPJ Investments, LLC v. Ameritx, LLC*, 2006 WL 2556409 (Conn. Super. Ct. Aug. 11, 2006). That court, like Dubreuil, held that "may" created an option so that arbitration was not mandatory. *Id.*

> 6. *There Is No Established Legal Meaning That "May" Means "Shall" When Used In An Arbitration Provision So That "May" Can Be Given Its Usual Permissive Meaning*

The object of Abbott's attempt to convince this Court that "may" always means "shall" when used in an arbitration provision is so that it can argue that "may" has an established legal meaning in such a context and that is the meaning

55

that should be given "may" in this case. Appellant's Brief at 22. The upshot of a thorough analysis, however, is that "may" does not consistently mean "shall" when used in arbitration provisions. In fact, it is not unusual for "may" to simply mean "may" in such a context. And that is its meaning here.

## CONCLUSION

Applying the Texas rules of construction in a straightforward fashion, it is apparent that the district court made the correct decision at every juncture. It should have, and did, consider the parties' other agreements signed as a part of the same transaction. It also should have, and did, consider the language in light of the surrounding circumstances and the parties' negotiations. In doing these things, the district court determined that it should conduct a preliminary trial to determine if the parties agreed to mandatory arbitration. Ultimately, the district court correctly decided that the parties had not agreed to a mandatory arbitration process, but that any arbitration under the National Marketing and Distribution Agreement would be optional.

This Court should affirm the judgment below in all respects.

Respectfully submitted,

_____
George E. Bowles
   State Bar No. 02743300
Paul F. Schuster
   State Bar No. 00784931
Cynthia K. Timms
   State Bar No. 11161450
LOCKE LIDDELL & SAPP PLLC
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8000
(214) 740-8800 (Fax)

Nicholas H. Patton
   State Bar No. 1563100
PATTON, TIDWELL & SCHROEDER,
LLP
4605 Texas Boulevard
P.O. Box 5398
Texarkana, Texas 75505-5398
(903) 792-7080
(903) 792-8233 (Fax)

**ATTORNEYS FOR RETRACTABLE
TECHNOLOGIES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 10th day of September 2007, two true and complete copies and electronic PDF copy on 3½ inch diskette of the foregoing Brief of Appellee Retractable Technologies, Inc. has been sent by First Class U.S. Mail to the following counsel of record for the Appellants:

| | |
|---|---|
| Paul F. Strain | W. Lance Lee |
| John A. McCauley | Young, Pickett & Lee |
| Venable LLP | 4122 Texas Boulevard |
| Suite 1800 | Texarkana, Texas 77503 |
| Two Hopkins Plaza | |
| Baltimore, Maryland 21201 | |

I further certify that on this 10th day of September 2007, seven true and complete copies and electronic PDF copy on 3½ inch diskette of the foregoing Brief of Appellee Retractable Technologies, Inc. has been sent by Federal Express, next day delivery to the Clerk of this Court at 600 S. Maestri Place, New Orleans, Louisiana 70130.

_____
Cynthia K. Timms

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to FRAP 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of FRAP 32(a)(7)(B) because

1.      Exclusive of the exempted portions in FRAP 32(a)(7)(B)(iii), the brief contains 13,543 words.

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using:

Software Name and Version:  MICROSOFT OFFICE WORD 2003,
Typeface Name:  Times New Roman,
Font Size:  14 point.

3.      Pursuant to Fifth Cir. R. 31.1, an electronic version of the brief has been filed with the clerk.

4.      The undersigned understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Fifth Circuit Rule 32.3, may result in the court's striking the brief and imposing sanctions against the person signing the brief.

_____
Cynthia K. Timms